OPINION OF THE COURT
Paul G. Feinman, J.
Plaintiffs, a group comprised of organizations and individuals sincerely and legitimately concerned with the state of the New York City school system, move for a preliminary injunction (1) enjoining the closure or phasing out of certain designated schools within the New York City school system; and (2) enjoining certain charter schools from being co-located in existing public schools. A temporary restraining order, which the parties voluntarily entered into, as opposed to being imposed on the parties by the court, is presently in place. Consequently, the plans of defendants Board of Education of the City School District of the City of New York (BOE) (now known as the Panel for Education Policy [PEP]), and Dennis M. Walcott, Chancellor of the New York City Department of Education (Chancellor), affecting these schools are being held in abeyance pending this court’s decision on plaintiffs’ motion.
I. Background
The Department of Education (DOE) is the mayoral arm of PEI] tasked with the administration of the City’s schools. The DOE has made controversial decisions of late concerning the future of the City’s schools, and hence, the education of our children, which have led to impassioned opposition, and this and other lawsuits.[1] In 2010, plaintiffs brought a proceeding entitled Mulgrew v Board of Educ. of the City School Dist. of the *353 City of N.Y. (28 Misc 3d 204, 207 [Sup Ct, NY County 2010] [Mulgrew 1]), when the DOE sought to “close and/or significantly change the utilization” of 20 low-performing schools in the City. The present plaintiffs sued in Mulgrew 1 to halt the DOE from pursuing the phaseout/closure or co-location of the schools. Passing familiarity with Mulgrew 1 and the statutory and regulatory scheme involved is presumed.
In Mulgrew 1, defendants herein filed educational impact statements (EISs) concerning the 20 schools, as set forth in Education Law § 2590-h (2-a) (b). Joint public hearings were held concerning the EISs. (Education Law § 2590-h [2-a] [d].) On January 26, 2010, PEP voted to approve 19 of the 20 proposed closures or changes.
Petitioners in Mulgrew 1 (plaintiffs here) challenged all phases of the closure process. Of interest to the current action, the court (Joan B. Lobis, J.) held that the EISs “failed to provide the detailed analysis an impact statement mandates.” (28 Misc 3d at 211.) The court found that the EISs were replete with “boilerplate” language rather than specifics of the expected impacts the closures and changes would have on students (id.), and ruled that the Mulgrew 1 respondents had “failed to comply with the requirements of Education Law § 2590-h”; that the decision to close the 19 schools was “null and void”; that the respondents must reissue the EISs for each of those schools; and that until compliance with the Education Law was complete, closure of the 19 schools was to be permanently enjoined. (Id. at 214.) Mulgrew 1 was affirmed by the Appellate Division, First Department. (75 AD3d 412 [1st Dept 2010].)
After the decision was rendered in Mulgrew 1, the parties entered into a letter agreement, dated July 14, 2010, “with regard to the interpretation and implementation for the 2010-2011 school year” of the decision.* [2] (Aff of Adam S. Ross, exhibit A.) In the letter agreement, the DOE agreed not to co-locate certain charter schools in certain specified school buildings, and set forth an education plan to be implemented for the 2010-2011 school year in the schools affected by Mulgrew 1. The *354 education plan provided, first, that (a) “ATRs” would be deployed within the affected schools as teachers, guidance counselors, social workers, and psychologists, among other things, to provide additional educational, social and emotional support for the students. (Id. at 2.) ATRs are teachers who have been “excessed” from their jobs, through no fault of their own, who are paid while they await further deployment. ATRs are usually certified to teach in certain areas, although they might be sent to teach in areas outside their area of expertise.
In section (b) of the letter agreement, the DOE was to implement “on-line recovery programs, provided that the school infrastructure supports the implementation.” On-line recovery programs are designed to allow overage or undercredited students to obtain the necessary credits to graduate.
In section (c), the “Children First Networks” program (Networks) “will be responsible for developing a plan with the school leadership to identify a community based organization or organizations to support students and families with socioeconomic challenges.” (Id.) Section (d) required plaintiff United Federation of Teachers (UFT) to consult with the DOE “regarding school leadership.” (Id. at 3.) Section (e) required the Superintendent to “closely and carefully review” comprehensive education plans (CEPs) for each school, implementation of which would be made by the DOE. (Id.) Section (f) called for a “curriculum audit” to be produced in each school, to be completed by “full-time DOE staff.” (Id.)
Section (g) called for. Networks specialists with “expertise in instructional support for ELL [English language learners] and special education students” to provide “targeted professional development and curriculum development for the school staff on strategies that have proven effective with ELL and special needs students.” (Id.) In section (h), Networks is charged with working with principals and already established “inquiry, departmental, grade level and content” teams “to develop instructional support plans aligned with the CEE” (Id.)
Section (i) required principals and schools to “assess the schools’ resources and space to determine whether the possibility of establishing a Teacher Center exists.” (Id.) Finally, section (j) provides that the DOE and UFT, acting for the benefit of the Mulgrew 1 petitioners, form a “joint committee” to oversee the implementation of the letter agreement, hear concerns and recommend solutions, as applicable. (Id.)
*355 II. Present Action
In December 2010, the DOE announced the imminent phaseout/closure of 19 of the schools involved in Mulgrew 1, despite the existence of the letter agreement from the previous school year. This action is brought as a plenary action, asserting three causes of action: one for breach of contract, and two for declaratory relief, one of which is related to the school closures. As part of their prayer for relief, the plaintiffs seek an order compelling specific performance of the letter agreement and a declaration that defendants have breached the letter agreement. They seek to permanently enjoin the closures, and bring this motion to do so preliminarily.[3] Plaintiffs argue that defendants made no real effort to comply with the requirements of the letter agreement, and, in their failure, are not entitled to phase out or close the schools. The third cause of action seeks declaratory relief related to certain proposed school co-locations. As part of the prayer for relief, plaintiffs seek a permanent injunction barring the DOE from co-locating 19 charter schools into designated public schools, which plaintiffs claim cannot withstand the insertion of new charter schools, due to space, time and resource constraints. Plaintiffs claim that the proposed co-locations of the charter schools is unfair to the public school students already carrying the burden of underfunded and depleted resources, and whose schools have seriously challenged student populations.
III. Discussion
A. Preliminary Injunction Based on Alleged Breach of Letter Agreement
It is important to note at the outset that it is not the role of the judiciary to pass in a general way on the wisdom, or lack thereof, of the educational policy decisions made by the other branches of government. Rather, if as here, a specific case presents a claim for breach of contract, the court must decide first whether there is a contract, second whether there was a breach, and finally, if so, what is the remedy for such breach.
“The party seeking a preliminary injunction must demonstrate a probability of success on the merits, danger of irreparable injury in the absence of an injunction and a balance of equities in its favor.” (Nobu Next Door, LLC v Fine Arts Hous., *356 Inc., 4 NY3d 839, 840 [2005]; see also 1234 Broadway LLC v West Side SRO Law Project, Goddard Riverside Community Ctr., 86 AD3d 18 [1st Dept 2011].) The evidence must be “clear and convincing.” (Temple-Ashram v Satyanandji, 84 AD3d 1158, 1161 [2d Dept 2011] [internal quotation marks omitted].)
Plaintiffs claim that it is clear that the DOE breached the letter agreement, in that it has, allegedly, utterly failed to comply in good faith with the letter agreement’s 10-part education plan. Plaintiffs provide affidavits from 11 individuals, representing 11 of the schools slated for closure, most of whom are members of their school’s student leadership teams. After describing the challenges faced by each school as a result of the makeup of its student body, the affiants go down the list of the requirements of the letter agreement, and find the DOE’s response lacking in almost all respects.
Most of the affidavits complain that, for one reason or the other, the assignment of ATRs to each school did “not appear to be informed by, let alone aligned with, any specific goal or improvement effort” for that school. For example, the affiant from Jamaica High School (Jamaica) states that Jamaica was assigned fewer ATRs than in previous years, and that several of them left during the school for such reasons as injury leave and retirement, and were never replaced. (Aff of James Eterno.) An affiant speaking for Global Enterprise Academy (Global) notes that the education plan for Global called for only three ATRs, but that no social worker ATR, although required, was ever assigned to the school. (Aff of Claudia Giordano at 4.) An affiant at the Acádemy of Environmental Science Secondary School complains that the education plan only called for two ATRs, one licensed in math and one in social studies, but that both left before the school year began, and were never replaced. (Aff of Daniel Simoes.)
Likewise, plaintiffs’ affiants maintain that the on-line credit recovery programs plans were not implemented, because the schools’ computers were outdated (aff of James Eterno, for Jamaica High School); the plans were introduced way after the new closures were announced, and too late to be effectively utilized by the 2010-2011 student body (aff of Christine Rowland, for Christopher Columbus High School Campus); or that the education plan for a particular school “did not even attempt to provide for additional support for credit recovery.” (Aff of David Pecoraro, for Beach Channel High School, at 5.)
The affidavits continue in this vein, affirming failures of the DOE with regard to support for socioeconomic challenges, by *357 the failure of Networks to, in one manner or another, “identify a community based organization or organizations to support students and families with socio-economic challenges” which exist at each school (see aff of David Pecoraro at 6; aff of J. Matthew Schley at 5); the failure of the DOE to implement sufficient CEP review; to provide instructional support plans; to provide for curriculum audits; and to establish teacher centers. In sum, plaintiffs provide affirmational support for their claim that the letter agreement was substantially breached.
The DOE replies that it substantially complied with the letter agreement, and acted at all times in good faith. The DOE’s chief operating officer of school support, Justin Tyack, affirms that 118 ATRs were deployed to all 19 schools, although the number varied over the course of the school year due to voluntary transfers, retirement and sick leave, as provided for in the ATRs’ collective bargaining agreement. Tyack explains that
“throughout this period, our Human Resources staff, in collaboration with superintendents, network leaders and principals, attempted to find replacement ATR teachers with varying success. In some cases, replacement ATRs were not assigned because the DOE was not able to identify an ATR in an appropriate license specialty area and seniority district to assign to the school. The fact that some teachers subsequently accepted other transfers deemed more desirable, or chose to retire or take extended sick leave, does not suggests that the DOE failed to comply with subdivision (a) of the letter agreement.” (Aff of Tyack at 3.)
As for section (b), calling for the implementation of on-line credit recovery programs, Tyack states that all but seven of the 19 schools already had an on-line credit program; that of the seven which did not, four were not high schools, which do not accumulate “credits,” and so were not required to have the program; and that the remaining schools “made the pedagological decision not to implement an online credit recovery program in spite of their opportunity to do so.” (Id. at 4.) Thus, the DOE claims compliance with the letter agreement, section (b), to the extent possible.
Similarly, the DOE claims compliance with all the remaining obligations under the letter agreement, including the establishment of community-based organization partnerships within each school; appropriate CEPs established for each school; cur *358 riculum audits as required; programs to benefit ELL and special education students put into place; and the establishment of school teams involving Networks staff.
As for the development of teacher centers, section (i), Tyack attests that several schools have received the required assistance, while those which have not either lack the space or resources, or have been “provided supports like those offered by Teacher Centers by hiring instructional coaches” and other appropriate support staff. (Aff of Tyack at 7.) Finally, Tyack affirms that a joint committee “was formed with two DOE members and two UFT members,” as required in section (j), and that the joint committee has met in October 2010 and February 2011. Thus, the DOE claims that it has substantially complied with the letter agreement.
It is clear that there is a stark difference of opinion concerning the DOE’s compliance with the letter agreement. Plaintiffs have made a very detailed case for the DOE’s noncompliance, but that does not negate the issues of fact raised by the DOE’s response. It is the court’s obligation to infer the parties’ intent in fashioning a contract, as it is “clearly expressed within the four corners of their writing.” (PPF Safeguard, LLC v BCR Safeguard Holding, LLC, 85 AD3d 506, 509 [1st Dept 2011].) Here, because it is not possible to determine whether the DOE has complied with the clear written agreement between the parties, and as there are sharply disputed factual issues, preliminary relief is not justified.
More starkly, however, is the possibility that an injunction to the closure of schools was never meant to be a remedy under the letter agreement, whether or not the DOE is in breach of that agreement. Former Chancellor Joel Klein has made it very clear in his affidavit that he would never have approved the letter agreement if it included a term barring the DOE from closing designated schools. Klein’s position is a logical interpretation of the agreement viewed through DOE’s prism. Indeed, plaintiffs concede, as they must, that such relief is not expressly found in the letter agreement. However, Adam S. Ross, Special Counsel for the UFT, makes plain in his affidavit that
“while the Defendants are correct that the Agreement does not foreclose the DOE from ever seeking to close these schools, their contention that their promise to provide specified supports for these schools in the 2010-2011 school year ... is completely irrelevant to any further decision to close is *359 incorrect. For the entire thrust of Petitioners’ action — and agreement to allow certain co-locations— was premised upon the DOE obligating itself to give these schools additional support to help them succeed. If that chance were given, and the schools did not succeed (as defined by the Chancellor), then the schools could certainly be subject to closure. On the facts set forth in the accompanying affidavits, however, there can be no genuine belief that the supports were provided as promised.” (Aff of Adam S. Ross at 3-4.)
Plaintiffs’ request for a preliminary injunction based on the DOE’s alleged failure to comply with the letter agreement is based on their fervent belief that, had these schools received the supports promised, they would have raised themselves up to such a level that closure would no longer be supportable. However, because there is no clear and convincing evidence that these low-performing schools could be so easily turned around, to adopt plaintiffs’ position would require the court to engage in speculation as to what might or might not have come to pass had the letter agreement been strictly followed. As such, plaintiffs have not established a likelihood of success on the merits based on any alleged breach of the letter agreement.
B. Preliminary Injunction Based on Alleged Breach of Commissioner’s Regulations
Both sides agree that the issue of whether DOE can phase out or close the schools under the regulations of the Commissioner of the New York State Education Department (SED) (8 NYCRR 100.2 et seq.) is a matter which must be brought before the Commissioner. Plaintiffs claim that the DOE has failed to comply with the SED’s oversight framework, as set forth in the Commissioner’s regulations, in calling for the closure of the schools.
Under SED’s “Differentiated Accountability” framework, schools that receive the status of “Schools Under Registration Review” (SURR) (8 NYCRR 100.2 [p] [11] [i]) and “Persistently Lowest Achieving Schools” (PLA) (8 NYCRR 100.2 [p] [11] [ii]), receive enhanced oversight to raise their level of achievement before closure is considered.[4]
SURR/PLA schools, which account for 12 of the targeted schools, cannot be closed or phased out without obtaining the *360 Commissioner’s approval. The DOE must “submit for commissioner’s approval, a plan identifying the intervention that will be implemented and will result in phase out or closure.” (8 NYCRR 100.2 [p] [11] [iv].) Approval may be granted if:
“(a) official resolutions or other approvals to phase out or close the existing school have been adopted by the local board of education (in New York City, the chancellor or chancellor’s designee);
“(6) a formal phase out or closure plan has been developed and approved in accordance with the requirements of the intervention prescribed by the commissioner pursuant to subparagraph (10) (iv) of this subdivision; and
“(c) parents, teachers, administrators, and community members have been provided an opportunity to participate in the development of the phase out or closure plan.” (Id.)
The intervention which the DOE claims is applicable to the 12 SURR/PLA schools is the “turnaround” model. (8 NYCRR 100.2 [p] [10] [iv] [a] [1]; aff of Edward Hui at 6.) The DOE claims that, under this model, new schools will be phased in to replace the old schools, each with a new principal, and “teaching staff screened by the UFT selection criteria.” (Aff of Edward Hui at 6.)
On May 9, 2011, the DOE provided the SED with applications for “School Improvement Grants” (SIG), regarding all of the schools designated for closure or phaseout (as well as other schools). A revised SIG application was submitted on May 16, 2011 for each school, a sample of which is attached to Hui’s affidavit as exhibit A.
Later, on June 13, 2011, SED advised the DOE to submit “supplemental” formal phaseout plans, which would be drafted pursuant to a template SED “was in the process of drafting.” (Id. at 12.) The information SED requested is substantial (id., exhibit B [“Phase Out Requirement for SURR schools”]). Hui attests that
“DOE is in the process of gathering the requested information and will begin filling in the template as soon as it arrives. The DOE will submit these ‘formal phase-out plans’ to SED as quickly as possible following receipt of the template, and based on representations made by SED, expects a decision no later than July 31, 2011.” (Id. at 12.)
*361 Plaintiffs vociferously complain, understandably, that the DOE only thought to submit a formal phaseout plan after this action was started, but that does not alter the fact that the DOE is in the process of compliance with the Commissioner’s regulations, however tardy, and that, more importantly, the Commissioner has accepted those filings, and has agreed to consider them. Until the matter has been addressed by the Commissioner, it is not yet ripe for adjudication and any objection to the Commissioner’s holding, when it comes, would be subject to another proceeding. Defendants’ compliance with the regulatory structure for failing schools has not yet been adjudicated and so plaintiffs cannot show a clear right to an injunction at this time based on the DOE’s alleged failure to comply with the Commissioner’s regulations.
C. Preliminary Injunction Barring Co-Locations of Charter Schools
Plaintiffs vehemently object to the proposed co-location of 19 charter schools into existing public schools, claiming that the co-locations will harm the public schools by causing them to become seriously overcrowded, to the detriment of currently successful programs. They further contend that there will be harm to less successful programs which will be caused to fail by the inclusion of the charter schools. Plaintiffs also believe that the charter schools are unfairly receiving especial attention and financing that is denied to the public schools, making for a marked inequality in the nature of the schools’ learning environments.
“Before a charter school may be located or co-located in an existing public school building . . . the chancellor shall identify which public school buildings may be subject to location or co-location, provide the rationale as to why such a public school building is identified for location or co-location and shall make all such information publicly available . . . .” (Education Law § 2853 [3] [a-3] [1].)
The request for a co-location for a charter school in an already existing public school[5] begins with the preparation of a building usage plan (BUP). (Education Law § 2853 [3] [a-3] [2].) The BUP must contain such things as:
*362 “(A) the actual allocation and sharing of classroom and administrative space between the charter and non-charter schools;
“(B) a proposal for the collaborative usage of shared resources and spaces between the charter school and the non-charter schools, including but not limited to, cafeterias, libraries, gymnasiums and recreational spaces, including playgrounds which assures equitable access to such facilities in a similar manner and at reasonable times to non-charter school students as provided to charter school students;
“(C) justification of the feasibility of the proposed allocations and schedules set forth in clauses (A) and (B) of this subparagraph and how such proposed allocations and shared usage would result in an equitable and comparable use of such public school building.” (Education Law § 2853 [3] [a-3] [2] [A]-[C].)
Pursuant to Education Law § 2853 (3) (a-3) (3), the BUP is to be contained in an EIS, which is itself required under Education Law § 2590-h (2-a). The EIS is subject to public filing, followed by a public hearing, and is finally subject to a vote by PEI] pursuant to Education Law § 2590-h (2-a) (c) and (d). The DOE filed EISs with BUPs for all of the proposed co-locations, 17 of which were approved by PEP in February and March 2011.
In a decision of the Commissioner in Appeal of Espinet (50 Ed Dept Rep, Decision No. 16,212, 2011 NY Educ Dept LEXIS 27 [Mar. 31, 2011]), in a matter involving the co-location of a single charter school into a public school building, the Commissioner held that the DOE’s BUP was insufficient, in that, while it contained many of the specifics required by the Education Law, it failed to comply with the statutory requirements:
“regarding the equitable allocation of shared spaces such as the gymnasium and library. Specifically, I find that the January 21 EIS fails to provide a ‘justification of . . . how [its] proposed allocations and shared usage would result in an equitable and comparable use of [the public school] building’ as required by Education Law § 2853 (3) (a-3) (2) (C).” (2011 NY Educ Dept LEXIS 27, *24.)
The Commissioner, referring to Mulgrew 1, reiterated that
“ ‘[t]he discussion of one [of the substantive requirements of Education Law § 2590-h (2-a) (b)] does not *363 obviate the need for a discussion of the other.’ Likewise, inclusion of a proposal for the collaborative use of shared spaces, as required by Education Law § 2853 (3) (a-3) (2) (B), does not obviate the need for the discussion of the justification of feasibility and equitable and comparable use required by Education Law § 2853 (3) (a-3) (2) (C). Indeed, it is just such information, which should be available to the public as part of an EIS, prior to any hearing, that affords meaning to the process set forth in Education Law § 2853 (3) (a-3).” (Id. at *26-27.)
In conclusion, the Commissioner nullified the EIS.
After Espinet, the DOE “substantially revised” the BUPs for 16 of the 17 challenged co-locations set forth in table B in the complaint (at 36). (Defendants’ mem of law at 22.) The DOE contends that all of plaintiffs’ complaints as to the “superseded” BUPs have been rendered moot, as the new BUPs now contain the required justifications. Hearings were held concerning the revised EISs, and PEP voted to approve all of the co-locations at issue on June 27, 2011.
Plaintiffs complain that the revised EISs and BUPs are invalid because PEP has already voted on the original applications, and that “there are no active EIS/BUPs for the DOE to amend.” (Plaintiffs’ mem of law at 45 n 12.) However, this court agrees with defendants that Education Law § 2590-h (2-a) (d-1) allows for such revisions. This section states that the Chancellor “may substantially revise” the application for a significant change to the school utilization, to be filed in the same “manner” as in the original application. It has been held that the requirement in Education Law § 2590-h (2-a) (c) that an EIS must be filed at least six months in advance of the commencement of the school year is not abrogated by an amended or revised EIS. (See Appeal of Battis, 50 Ed Dept Rep, Decision No. 16,115, 2010 NY Educ Dept LEXIS 109 [Aug. 2, 2010].) “Time” and “manner” are two different things, and “treating them otherwise . . . would only discourage the making of revisions in response to public comments, which would be contrary to the statute’s intent.” (2010 NY Educ Dept LEXIS 109, *20-21; Appeal of McCall, 50 Ed Dept Rep, Decision No. 16,257, 2011 NY Educ Dept LEXIS 72 [July 14, 2011] [citing to Battis]; Appeal of Litichevsky, 50 Ed Dept Rep, Decision No. 16,254, 2011 NY Educ Dept LEXIS 69 [June 28, 2011] [citing to Battis].)
Therefore, the DOE’s revised EISs and BUPs were properly before the PEP when it voted in the DOE’s favor on June 27, *364 2011, and discussion of the superseded BUPs and EISs is immaterial. The present matter rests on the recently approved and operational BUPs, and the BUPs for the two remaining schools, regarding co-locations in buildings M188 and M123, which were approved by PEP on April 28, 2011. (See intervenors’ mem of law at 8.)
As this is a motion for a preliminary injunction, it is not necessary to finally resolve any issue; the court must merely decide whether there is a likelihood that plaintiffs will be successful on the merits by presenting evidence that the BUPs and EISs do not address all relevant concerns. This court finds that, unlike the BUPs in Mulgrew 1, the present BUPs contain sufficient detail to challenge plaintiffs’ claims that the BUPs are deficient, so as to defeat the motion.
The Commissioner in Espinet was concerned with “boilerplate” language appearing in the BUP there in issue. While, as the intervenors admit (mem of law at 14), similar “boilerplate” language appeared in the superseded BUPs, the 17 new, operative BUPs now provide specifics not only as to what hours will be carved out for each activity (such as lunch or gym) for each school, but why that allotment is reasonable. (See e.g. aff of Andrew R. Dunlap [Binder], exhibits 7, 12, 17, 22, 27, 32, 42, 47, 52, 64, 69, 76.) For example, the superseded BUPs contained language pertaining to the feasibility of each plan which could be considered “boilerplate,” reading as follows:
“[t]his proposed plan illustrates how the population size of each co-located school will be used to determine a proportional allotment of time in each shared space. Building Councils are free to deviate from the proportional allotment of time to accommodate the specific programmatic needs of all special populations or groups within each school as is feasible and equitable, provided that the Building Council comes to an agreement of the final Shared Space Plan collaboratively. If such accommodation results in an alteration to the proportional distribution of space, the Building Council shall explain the basis for such alteration.” (Aff Charles G. Moerdler exhibit 4.)
This language was followed by a statement of the enrollment numbers of each school, and a table of shared spaces and proposed time allotments.
The operative BUPs now expand on this information to explain, in each instance, why the determination of shared space *365 and allotments is being made, with regard to the needs of each public school and each charter school, such as the nature of the populations and the special needs of each school.
Plaintiffs recount in considerable detail why they believe that the co-locations are not feasible or equitable under the operative BUPs. However, these opinions do not negate that the BUPs now fulfill their obligation of completeness under the Education Law; the issue is only that the plaintiffs disagree with defendants as to the expected outcome of each co-location. Disagreement as to the facts does not establish the likelihood of success on the merits required to obtain a preliminary injunction, and an injunction is not warranted on the basis of plaintiffs’ disapproval of the operational BUPs.
Defendants argue that the present action as to the co-locations is premature, in that plaintiffs have failed to exhaust their administrative remedies, by bringing this action to nullify the BUPs before appealing to the Commissioner. The basis of this argument is language in Education Law § 2853 (3) (a-5), which provides that, if a decision by the BOB is in dispute, the dispute “may be appealed to the commissioner pursuant to section three hundred ten of this chapter.” Section 310 also states that disputes “may” be brought before the Commissioner.
Defendants (and intervenors) read “may” in the statutes to mean “shall,” making an appeal to the Commissioner plaintiffs’ only recourse. This is not so.
This court finds that it has concurrent jurisdiction to hear disputes over actions taken by the BOE. (See Matter of Galloway v Soletan, 20 AD2d 796, 796-797 [2d Dept 1964] [“Supreme Court has concurrent jurisdiction with the Commissioner of Education to hear and determine” applications]; see also Matter of Bean v Board of Educ. of Union Free School Dist. No. 17, Town of Oyster Bay, 71 Misc 2d 747 [Sup Ct, Nassau County 1972].) The Legislature is quite capable of providing for the placement of exclusive jurisdiction with the Commissioner if it so chooses. (See Matter of Duke & Benedict v Board of Educ. of Carmel Cent. School Dist, 81 Misc 2d 1043, 1045 [Sup Ct, Putnam County 1975] [exclusive jurisdiction found to lay with Commissioner under Education Law § 2037, which provides that disputes “shall” be referred to the Commissioner].) Therefore, this action is properly before this court.
It is not necessary for this court to discuss the issues of irreparable harm or the balancing of the equities, because the first element for the grant of a preliminary injunction has not been *366 established with regard to either the school closures or the matter of the co-locations of the charter schools. However, the court notes that the question of where the equities lie is not clear-cut, and the facts do not lean inexorably in the direction of either party.
If the failing public schools are not closed, students may be subject to substandard educational environments which will obviously cause them to be considerably harmed. Compelling the DOE to further comply with the letter agreement, if such were to be required, may or may not benefit students, depending upon one’s faith in the education plan there embodied to remedy all or most of a failing school’s problems. The equities do not clearly tip in either direction.
Similarly, allowing the charter schools to co-locate into the various public schools may or may not result in overcrowding or an unfair distribution of resources, as plaintiffs claim, or may result in a fair and equitable distribution of those resources, as defendants aver. Barring the charter schools from expanding into the public schools will cause considerable difficulty to students already slated to start the 2011-2012 school year as scheduled, and would cause these schools hardship in attempting to locate, and pay for, private leased space. Again, the court is not convinced that the equities tip in either direction.
IV Conclusion
The court ends where it began, with the observation that the court’s role here is circumscribed by the law and the form of the proceeding, here a plenary action for breach of contract and a declaratory judgment. The court is not permitted, nor would it be appropriate, to substitute its own view of this complex societal question of how best to educate our children for the conclusions already reached by the legislative and executive branches. The remedy which plaintiffs may be entitled to, should they ultimately prevail and establish a breach by the DOE, remains to be defined. This decision merely concludes that, on a preliminary basis, DOE cannot be enjoined from proceeding given the many sharply disputed factual issues; it does not answer the ultimate questions presented by this lawsuit.
Because plaintiffs have failed to show a likelihood of success on the merits on their claims for a declaration that would enjoin *367 the closure or phaseout of the designated schools, or would bar the co-locations of the charter schools in the designated public school buildings, their motion must be denied.
Accordingly, it is ordered that plaintiffs’ motion for a preliminary injunction is denied.

. A related suit, Steglich v Board of Educ. (index No. 107173/2011 [Steglich 2]) is currently pending before this court. In that action, the court has previously denied the plaintiffs’ motion for a preliminary injunction, and the Appellate Division, First Department, declined to issue a stay. The temporary restraining order in Steglich 2, which was voluntarily consented to by the parties, expired by its own terms on July 1, 2011.
On Monday, July 18, 2011, plaintiffs in Steglich 2 argued a motion for partial summary judgment, which, reduced to its core, seeks a declaration that the procedures used to approve the co-location of a new charter school at the Brandéis campus on the Upper West Side were improper, and therefore, a permanent injunction should issue barring co-location of the new charter school on that campus for the upcoming school year. While the instant case presents *353 some of the same legal and factual issues, each case must be decided on its own merits, and on the record developed by the parties in the particular litigation; thus, a separate decision in the Steglich 2 case will issue in due course.

. Plaintiffs call the letter agreement a “Settlement Agreement,” but, it is noted that, while it settled certain issues between the parties, the letter agreement was not made in complete settlement of Mulgrew 1, in other words, in lieu of Justice Lobis’s grant of a permanent injunction.

. The action has been joined by numerous intervenors, speaking for the defendants, and amici curiae supporting the plaintiffs.

. The provisions in the letter agreement mirror the types of interventions required under the Differentiated Accountability program.

. The court notes that co-location is not limited to charter schools; many public schools have more than one school co-locating within its walls.